**The MORNING CALL, INC., Appellant,**

v.

**BELL ATLANTIC–PENNSYLVANIA, INC., Appellee.**

Superior Court of Pennsylvania.

Argued Jan. 12, 2000.
Filed Oct. 10, 2000.

Malcolm J. Gross, Pittsburgh, for appellant.

John E. Graf, Pittsburgh, for appellee.

BEFORE: FORD ELLIOTT, STEVENS and BECK, JJ.

BECK, J.:

¶ 1 We address the legal interest in real property that Bell Atlantic Pennsylvania, Inc. (Bell) acquired from a landowner when it placed its equipment on a building

in order to provide telephone service. We find that Bell acquired an irrevocable license and affirm the trial court.

¶2 The Morning Call, Inc. (The Call) owns two properties, at 106 and 114 N. Sixth Street in Allentown, Lehigh County, both of which it purchased in 1998. In 1917, Bell attached telephone equipment to the rear walls of these properties, in order to provide them, and adjoining rowhomes, with phone service. The equipment has been continuously used and maintained since 1917 and, in 1982, Bell installed new equipment. The equipment is clearly visible from the outside and The Call admits it was aware of the equipment's existence when it purchased the properties. Neither Bell nor The Call has been able to produce a document granting Bell permission to place and maintain the equipment. The court found, however, based on the testimony of Bell's engineer, that in the early years of telephone service property owners who desired service often granted Bell the right to place telephone facilities on their property by verbal agreement or handshake. There was no evidence that owners of the property ever sought to evict Bell from it.

¶3 Desiring to demolish the properties to create a parking lot, The Call asked Bell to remove its equipment. Bell informed The Call that to do so would cost $8,276.00 and that The Call must agree to pay the costs before Bell would relocate the facilities. The Call filed a complaint in equity seeking an injunction to require Bell to remove the equipment alleging it was placed without permission and that by refusing to remove it Bell was trespassing. Bell argued that it had a right to occupy the property: its equipment had been there since 1917 and was necessary to provide phone service to the property and adjacent occupied buildings.

¶4 At the preliminary injunction hearing, the parties agreed to a settlement, pursuant to which The Call deposited $8,276.00 in an escrow account and Bell removed the equipment. The settlement agreement provided that if the court determined that Bell Atlantic had a right to keep the equipment on the properties, Bell Atlantic would be given the escrow funds as compensation for having taken down the equipment. If, however, Bell had no such right, the funds would be returned to The Call. The court subsequently concluded, on the basis of the doctrine of presumptive grant, that Bell had acquired an easement over The Call's property and, therefore, had a right to have the equipment on the building. The court ordered that the escrowed funds be paid directly to Bell. This appeal followed.[1]

¶5 In its appeal, The Call claims the court erred in applying the doctrine of "presumptive grant" to find that Bell had an easement giving it a right to use The Call's property.[2] They continue to argue that Bell is a mere trespasser and has no right to have its equipment on the building. We agree with the trial court that Bell was not a trespasser, although we

---

1. Our scope of review in an equity matter is limited: we must accept the chancellor's findings of fact and we will not reverse the chancellor's determination absent a clear abuse of discretion or error of law. *Zivari v. Willis*, 416 Pa.Super. 432, 611 A.2d 293, 295 (1992). Findings of fact made by the chancellor will not be disturbed unless they are unsupported by competent evidence or are demonstrably capricious. *King v. Rock*, 415 Pa.Super. 605, 610 A.2d 48, 49 (1992).

2. Specifically, The Call raises three issues.
   1. Did the trial court err when it held that a public utility can gain an easement by presumptive grant solely based on its facilities being visible on the subject property and despite no evidence of a prior grant of easement being presented?
   2. Did the trial court err in finding that an entity with the power of eminent domain can obtain an interest in real property by presumptive grant?
   3. Did the trial court err when it applied the doctrine of presumptive grant to a case involving an easement, not a fee simple?

arrive at our conclusion through a different rationale.[3]

¶ 6 Instantly, the court's legal conclusions turned on two critical findings of fact. First, the court underscored that neither party could produce any evidence of a written agreement permitting Bell to install its telephone equipment on The Call's building. Second, the court credited testimony that in 1917 it was commonplace for property owners to make· informal agreements with the telephone company to permit installation of its equipment and found that Bell had provided service to the owners of this property without objection for more than eighty years. Trial Court Opinion, 6/7/99, at 2–3. On these facts, the court concluded that because Bell's use was consensual, Bell failed to establish a prescriptive easement over The Call's property. However, because Bell's use was of long duration and without challenge, the court invoked the rarely used rule of "presumptive grant" to find that Bell had been granted an easement to use the property. Trial Court Opinion, 6/7/99, at 4. While we agree with the court's conclusion that Bell had a legal right in The Call's land, we conclude that Bell's interest is more akin to an irrevocable license than to an easement based on a presumptive grant.

■■■ ¶ 7 The classification of interests in property which confer the right to use another's land is a complex subject framed by arcane historical rules.[4] Such interests, usually created by private agreement, are termed servitudes as a class, and include covenants, easements, licenses and profits. Jesse Dukeminier and James E. Krier, *Property*, at 787–88 (3d Ed.1993). Distinct rules distinguish each interest from the other, *id.*, and depending on how the transaction is classified, different legal incidents attach to the relationship. Cornelius J. Moynihan, *Introduction to the Law of Real Property* 68 (1962). Here, it is clear that Bell's interest in The Call's property was either an ·easement or a license.[5]

■■■ ¶ 8 An easement has been defined as "a liberty, privilege or advantage which one may have in the lands of another without profit. ..." *Coffin v. Old Orchard Dev. Corp.*, 408 Pa. 487, 494, 186 A.2d 906, 910 (1962). Generally, it requires that there be two tenements owned by distinct proprietors, one to which the right is attached and another on which it is imposed.[6] *Bradley v. American Tel. & Tel. Co.*, 54 Pa.Super. 388, 396 (1913) (citing Washburn's *Easements and Servitudes* (3d ed.) sec. 3). An easement may be created by express agreement in compliance with the Statute of Frauds, or by implication, necessity, or prescription.

■■■ ¶ 9 Here, the Court found that Bell had an easement created by a presumptive grant, *i.e.*, the law presumes a grant was made in the past, and evidence of it has been lost. Historically, this rarely used doctrine evolved with the law of

**3.** As is well-settled, if a lower court's decision is correct, we may affirm on any ground without regard to the theory adopted by the trial court. *Alco Parking Corp. v. Public Parking Authority*, 706 A.2d 343 (Pa.Super.1998), *appeal denied*, 555 Pa. 725, 725 A.2d 178 (1998).

**4.** Such interests for use of land are sharply distinguished from possessory interests in the land. *See, e.g., Clements v. Sannuti*, 356 Pa. 63, 65–66, 51 A.2d 697, 698–99 (1947). For a useful comparative study of servitudes and their functions, *see* Susan F. French, *Toward a Modern Law of Servitudes: Reweaving the Ancient Strands*, 55 S.Cal.L.Rev. 1261 (1982).

**5.** Neither a covenant nor a profit is applicable. The former requires a promise found in a conveyance; the latter involves a license coupled with an interest in a natural resource of the land. Jesse Dukeminier and James E. Krier, *Property*, at 787–88 (3d Ed.1993).

**6.** However, an easement can also be an easement in gross which is a personal right in the property of another because it is not appurtenant to other land owned by the grantee. An easement in gross, however, must be created by written grant. *See* 1 *Ladner on Conveyancing in Pennsylvania* §§ 11.01, 11.02 (4th Ed.1979).

prescription as a way to show that in the absence of a statute of limitation sufficiently long adverse use ripens into a legal right. As is well-settled, a prescriptive easement is acquired by analogy to the acquisition of title to land through adverse possession for twenty-one years. *Bodman v. Bodman*, 456 Pa. 412, 414, 321 A.2d 910, 912 (1974); 1 *Ladner on Conveyancing in Pennsylvania,* § 11.02(c) (4 th Ed.1979). Such a "prescriptive right is based upon the *presumption of a lost grant." Wampler v. Shenk*, 404 Pa. 395, 398, 172 A.2d 313, 315 (1961) (emphasis supplied) (quoting *Steel v. Yocum*, 189 Pa.Super. 522, 151 A.2d 815, 816 (1959)); Ladner § 11.02(c). *See also, Wallace v. The Fourth United Presbyterian Church*, 111 Pa. 164, 2 A. 347 (1886) (explaining that although the statute of limitations conferring title to an adverse possessor of land does not directly apply to an incorporeal right, the same considerations of policy and convenience, giving rise to the statute, by analogy to it, will in some cases raise a presumption applicable to the right issuing out of the land). The presumption will arise, however, only where the use has been adverse, open, notorious and uninterrupted for twenty-

one years. *Shinn v. Rosenberger*, 347 Pa. 504, 507, 32 A.2d 747, 748 (1943). If use is permissive a prescriptive easement cannot arise, no matter how long the use continues, and the passing of time under such circumstances does not raise the presumption of a grant.[7] *Id. See also, Demuth v. Amweg*, 90 Pa. 181, 185 (1879); *Garrett v. Jackson*, 20 Pa. 331, at 335–36 (1853); *Ladner, supra.*

¶ 10 Here, Bell's use was permissive for 82 years. The court correctly found that Bell did not have a prescriptive easement. Instead, citing a "practical necessity," the court categorized Bell's interest as an easement premised on a presumptive grant. As noted, the law of presumptive grants is not a model of clarity. However, historically it derives from prescriptive easements which cannot be found where permissive use exists. *See supra* at 7 n. 7. Accordingly, in light of the consensual origin of Bell's use of The Call's property, it is preferable not to characterize Bell's interest as a presumptive easement.

¶ 11 We next examine whether Bell's interest is more akin to a license.

---

**7.** The evident contradiction between a "lost grant" permitting use of the land and the requirement that use be adverse for 21 years is the result of a common law fiction developed in the 17 th century to address an anomaly in the evolution of the law of prescription. Prior to that time, prescriptive use was based on use from "time immemorial" or, after 1275, by analogy to the law passed by Parliament to settle old claims to possession, which prohibited challenges to rights enjoyed since 1189, the year Richard I ascended the throne. After Parliament failed to pass legislation comparable to the statutes of limitations of 1540 and 1623 for actions in ejectment, judges resorted to the fiction of a presumed "lost grant" to give a theoretical underpinning to *use* over an extended period of time. Thus, under the common law, the doctrine of "lost grant" came to stand for the proposition that adverse use over 20 years gives rise to a presumption that at some time in the past an express grant of such easement has been made and that the grant has been lost. Dukeminier, *supra* at 823.

In this country, the law of prescription developed using the statute of limitation approach, but many courts continued to invoke the common law presumption of a "lost grant." In Pennsylvania, despite an early case in which the Pennsylvania Supreme Court cogently observed:

It is often said that the period of twenty-one years' enjoyment authorizes a jury to presume a grant; .... But the premises being founded upon a fiction which has nothing substantial in it, and which is only tolerated for the purposes of remedy, the conclusion is necessarily unsound.

*Okeson v. Patterson*, 29 Pa. 22, 26 (1857), our courts continued to use the presumption. *See Wampler v. Shenk*, 404 Pa. 395, 172 A.2d 313 (1961); *Bennett v. Biddle*, 140 Pa. 396, 21 A. 363 (1891); *Workman v. Curran*, 89 Pa. 226 (1879); *Steel v. Yocum*, 189 Pa.Super. 522, 151 A.2d 815 (1959), *Fidler v. Rehmeyer*, 34 Pa.Super. 275 (1907). Over time, the doctrine of "presumptive grant" has found its way into cases related to possession and where use was not traditionally adverse. *See, e.g., School District of Donegal Township v. Crosby*, 178 Pa.Super. 30, 112 A.2d 645 (1955), relied on by the trial court herein.

Licenses are often compared to easements. In general, a license is a mere personal or revocable privilege to perform an act or series of acts on the land of another, which conveys no interest or estate. *Baldwin v. Taylor*, 166 Pa. 507, 31 A. 250 (1895).[8] A license is distinguishable from an easement because it is usually created orally,[9] *id.*, is revocable at the will of the licensor, *Stein v. Bell Tel. Co.*, 301 Pa. 107, 151 A. 690 (1930), and is automatically revoked by the sale of the burdened property. *Thompson v. Commonwealth Dept. of Highways*, 214 Pa.Super. 329, 257 A.2d 639, 642 (1969)(citing *Puleo v. Bearoff*, 376 Pa. 489, 103 A.2d 759 (1954)). However, a license may become irrevocable under the rules of estoppel and in those circumstances it is similar to an easement.[10] Dukeminier, *supra* at 800.

■■■■ ¶ 12 The Pennsylvania Supreme Court adopted the equitable doctrine of irrevocable license in the mid-nineteenth century stating that "a license to do something on the licensor's land when followed by the expenditure of money on the faith of it, is irrevocable, and is to be treated as a binding contract." *Huff v. McCauley*, 53 Pa. 206, 208 (1866); *Kovach v. General Telephone Co.*, 340 Pa.Super. 144, 489 A.2d 883, 885 (1985). The Court subsequently explained that such a license,

> while not strictly an easement, is in the nature of one. It is really a permission or license, express or implied, to use the property of another in a particular man-

ner, or for a particular purpose. Where this permission has led the party to whom it has been given, to treat his own property in a way in which he would not otherwise have treated it ... it cannot be recalled to his detriment.

*Harkins v. Zamichieli*, 266 Pa.Super. 401, 405 A.2d 495, 498 (1979)(quoting *Pierce v. Clelland*, 133 Pa. 189, 19 A. 352 (1890)). Thus, the irrevocable license gives "absolute rights, and protects the licensee in the enjoyment of those rights." *Cole v. Ellwood*, 216 Pa. 283, 289, 65 A. 678, 680 (1907). Moreover, "successors-in-title take subject to an irrevocable license if they had notice of the license before the purchase." *Kovach, supra* (quoting *Harkins, supra* at 498).

■■■■ ¶ 13 We find Bell's interest to be an irrevocable license. The origin of Bell's use of the land was permissive; its use was highly specific and narrowly defined, *i.e.*, to install telephone equipment. The burden on the land was minimal. There was mutual benefit to the license; Bell expanded its telephone business and the landowner received telephone service. Moreover, the license became irrevocable after Bell installed equipment on the premises. *Kovach, supra*; *Huff v. McCauley, supra*. Based on the understanding of the parties, Bell continued to make additional expenditures to maintain and modernize the equipment.[11] Subsequent owners, including The Call, took the property subject to the irrevocable license. *Id.*

---

8. The licensee is simply given permission by the occupant of land to do something that otherwise would be a trespass. Dukeminier, *supra*, at 800.

9. However, "[w]hen the owner of land, with full knowledge of the facts, tacitly permits another repeatedly to do acts upon the land, a license may be implied from his failure to object." *Turnway Corp. v. Soffer*, 461 Pa. 447, 461, 336 A.2d 871, 878 (1975) (quoting *Leininger v. Goodman*, 277 Pa. 75, 77–78, 120 A. 772, 773 (1923)).

10. It is interesting to note that in the new Restatement of Servitudes project of the

American Law Institute, it is expected that irrevocable licenses will no longer be listed among the servitudes "because no salient differences remain between ... irrevocable licenses and affirmative easements...." Susan F. French, *Tradition and Innovation in the New Restatement of Servitudes: A Report from Midpoint*, 27 Conn. L.Rev. 119, 125 (1994).

11. The record includes business records which reflect excavation and engineering efforts and, thus, the expenditure, undertaken by Bell in 1917 and again in 1982 to provide telephone service to the property.

¶ 14 Accordingly, we find that Bell used the premises under an irrevocable license. Therefore the funds in escrow are rightfully Bell's.

¶ 15 Order affirmed.